UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:                                                          CASE NO.

**HENDRIKUS EDWARD TON**                                        **18-11101**
                                                                SECTION A
DEBTOR                                                          CHAPTER 11


                                                                ADVERSARY NO.


**LYNDA RONQUILLO TON**                                         **18-1129**
PLAINTIFF

**VERSUS**

**HENDRIKUS EDWARD TON**
DEFENDANT

### MEMORANDUM OPINION

On May 9, 2019, the partition of former community property between Lynda Ronquillo Ton ("Lynda Ton") and Hendrikus Ton ("Hank Ton") came before the Court. Post-trial briefs were submitted on June 5, 2019 after which the Court took the matter under advisement.

## I.  FACTS:

On November 4, 1987, Lynda and Hank Ton (collectively the "Parties") married.[1] The Parties did not execute a marriage contract or prenuptial agreement. As a result, all property acquired during their marriage is presumed to be community property.[2]

---

[1] Stipulations for Community Property Partition Trial ("Stip."), P-38, Stip. 1.
[2] La. C.C. art. 2340 ("Things in the possession of a spouse during the existence of a regime of community of acquets and gains are presumed to be community, but either spouse may prove that they are separate property.").

1

On November 14, 2012, Lynda Ton filed a Petition for Divorce in the 25th Judicial Court ("25th JDC"), Parish of Plaquemines, Louisiana ("Petition for Divorce").[3] On August 5, 2013, the Judgment of Divorce was entered ("Divorce Judgment").[4] Under Louisiana law, a judgment of divorce is retroactive to the date of filing suit.[5] Thus, the community terminated on November 14, 2012 ("Termination").[6]

### A. Tax Liability

During the marriage, Hank Ton owned, as either the majority or sole owner and operator, Abe's Boat Rentals, Inc. ("Abe's"), Gulf Wells, Inc. ("Gulf Wells"), B&H Marine Transportation, L.L.C. ("B&H Marine"), and Mardi Gras Central, L.L.C. ("Mardi Gras Central").

On October 18, 2012, the Internal Revenue Service ("IRS") filed a criminal complaint against Hank Ton for failure to pay employee and employer payroll taxes. The Complaint alleged Hank Ton was a "responsible person" with a duty to collect and pay payroll taxes withheld from employee pay, as well as the employer's portion, to the IRS.[7] Hank Ton entered a Plea Agreement on October 5, 2012.[8] He admitted to underreporting withheld taxes related to Abe's from 2006 to 2009 ("Tax Liability").[9] As restitution to the IRS, he agreed to pay payroll taxes attributable to Abe's of $3,582,451.92.[10] Abe's was not charged nor did it sign the Plea Agreement.

---

[3] Case Number 60-082; Stip. 2; Exh. A1.
[4] Stip. 3; Exh. A2.
[5] La. C.C. art. 2356 cmt. (c).
[6] La. C.C. art. 2356:
> The legal regime of community property is terminated by the death or judgment of declaration of death of a spouse, declaration of the nullity of the marriage, judgment of divorce or separation of property, or matrimonial agreement that terminates the community.
[7] *See* Exhs. F4, F5, F6 at 3, F7, F8 at 3, F9–F11.
[8] Exhs. F6–F7.
[9] *Id*.
[10] Stip. 69; Exhs. F4–Fll.

A Factual Basis for Guilty Plea ("Factual Basis") was entered in the criminal case on October 24, 2012.[11] In the Factual Basis, Hank Ton stipulated to the following:

1. Defendant HANK TON was the sole owner of Abe's Boat Rentals, Inc. ("Abe's), Gulf Wells, Inc. ("Gulf Wells"), and Heather Marine, Inc. ("Heather Marine"). TON also owned approximately 51 percent of B&H Marine Transportation Services LLC (B&H) . . .

3. Gulf Wells entered into contracts with oil companies in the Gulf of Mexico to provide production services. All individuals working for Gulf Wells, except defendant HANK TON, were considered employees of Abe's for payroll and tax purposes and were paid by Abe's. . . .

4. B&H provided services similar to those offered by Abe's. All individuals working for B&H were considered employees of Abe's for payroll and tax purposes and were paid by Abe's. . .

7. At all times pertaining to this Factual Basis, federal law required various employers, including Abe's, to withhold federal income taxes and Federal Insurance Contribution Act ("FICA") taxes from their employees' wages. Employers were also required to pay the matching employer's portion of FICA taxes based on employee wages. . .

10. From at least on or about January 1, 2006, until on or about January 31, 2010, defendant HANK TON and Dominick Fazzio agreed to conceal from the IRS the salaries paid to employees of Abe's . . . in order to reduce the amount of employment tax Abe's owed the IRS. . .

16. During calendar year 2006, Abe's paid $91,954 in employment tax, when, in fact, as TON and Fazzio knew, Abe's owed $790,192.96 in employment tax, resulting in a tax loss to the United States of $698,238.96 for that year. . .

21. During calendar year 2007, Abe's paid a total of $171,340.64 in employment tax, when, in fact, as TON and Fazzio knew, Abe's owed $1,082,257.29 in employment tax, resulting in a tax loss to the United States of $910,916.65. . .

26. In calendar year 2008, Abe's paid $167,552.27 in employment tax, when, in fact, as TON and Fazzio knew, Abe's owed $1,163,542.15 in employment tax, resulting in a tax loss to the United States of $995,989.88. . .

---

[11] Exh. F8.

31. In calendar year 2009, Abe's paid $247,456.59 in employment tax, when, in fact, as TON and Fazzio knew, Abe's owed $1,224,763.02 in employment tax, resulting in a tax loss to the United States of $977,306.43.

32. In total, this scheme resulted in an employment tax loss to the federal government of $3,582,451.92.[12]

On May 30, 2013, Hank Ton was cast in judgment for restitution of $3,582,451.92 ("Restitution"), fined $25,500.00 and assessed $200.00 (collectively these sums are referred to as the "Restitution Judgment").[13]

On May 29, 2013 or approximately six (6) months after the Divorce Judgment,  Abe's borrowed $3,222,451.00 from Hancock Whitney Bank, N.A. ("Whitney") to partially satisfy the Restitution Judgment ("Loan 2").[14]  Loan 2 was guaranteed by Hank Ton.[15]  Lynda Ton did not consent.

## B.  25th JDC Orders Regarding Management of Community Assets

On November 21, 2013, Lynda Ton filed a Petition to Partition Community Property Pursuant to Louisiana Revised Statute 9:2801 and to Fix Time within Which Descriptive Lists Must be Filed ("Partition Petition") in the 25th JDC.[16]  Thereafter, the 25th JDC entered a number of orders regarding the management of community assets during the pending divorce proceedings and prior to the partition of the former community.  A consent judgment executed August 27, 2013, ("August Consent Order") ordered:

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that an Injunction shall issue herein, directed to the parties, their agents and assigns, prohibiting them from alienating, encumbering, wasting, disposing of, transferring, concealing, or

---

[12] Exh. F8.
[13] Exh. F11 at 5.
[14] *See* Exhs.  F1– F2, F11.
[15] *See* Exhs.  F1– F2, F11.
[16] *Id.*; Stip. 4; Exh. A4.

4

damaging any assets of the parties, the nature of which may be disputed as to whether community or separate to include the changing of any beneficiaries on any policies or accounts, and disposal of any property of the parties, without court order or written consent of both parties.[17]

A consent judgment executed February 14, 2014 ("February Consent Order") ordered:

> **IT IS ORDERED, ADJUDGED, AND DECREED** that there is permanent injunction should issue, directed to the Hendrikus Ton, his agents and/or assigns prohibiting him, his agents and assigns from alienating, transferring, selling, wasting, liquidating, or otherwise disposing of any or all of the assets of the parties or any property, the nature of which may be disputed as to whether separate or community. This injunction includes but is not limited to liquidating any assets owned by the following community businesses ABE'S BOAT RENTALS, INC, B&H MARINE TRANSPORTATION SERVICES, LLC, GULF WELLS, INC and MARDI GRAS CENTRAL, L.L.C.
>
> **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that in the event Hendrikus Ton, as representative/operator of the community businesses, through the ordinary scope and customary with his the business needs to sell an asset owned by a community businesses, he will do the following:
> 1. Notify Linda Ton through counsel within 3 days of his actual intent to sell a boat.
> 2. File with the Court to set an expedited hearing to acquire authorization from the Court through a contradictory hearing to sell such an asset.
> 3. Mr. Ton shall deposit any proceeds from any sale of any of the assets referenced herein to the registry of the Court in the above captioned matter. Any disbursement of such deposited funds will released only after a contradictory hearing and an order of the Court.[18]

**C. 25th JDC Orders for Spousal Support**

On January 13, 2014, Lynda Ton filed a Petition for Final Spousal Support and Motion and Order to Set Final Trial for Determination of Fault ("Support Petition").[19] The 25th JDC had previously approved several consent judgments for spousal support pending termination of the

---

[17] Exh. A3.
[18] Exh. A5 at 1–2.
[19] Exh. A9.

marriage and the entry of a final ruling on permanent support.[20] The February Consent Order fixing

interim spousal support due Lynda Ton at $15,000.00 per month[21] provided:

> [P]ayments will either be considered an advance on the community or final spousal support in the event Lynda Ton is awarded final support. . . . [and] all money received as income by Hendrikus Ton from any of the former community businesses will also be accounted for and considered an advance on the community pending the community property partition trial and further order of the Court.[22]

On August 13, 2018, the 25th JDC awarded Lynda Ton permanent spousal support in the

amount of $3,783.00 per month ("Final Support Judgment") retroactive to January 13, 2014.[23]   The

Final Support Judgment states:

> [A]s stipulated to by the parties at trial, the interim payments to Ms.  Ton that Hank Ton was ordered to make are to be considered an advance on the community to the extent that they are over and above the $3,783.00 permanent spousal support payments.[24]

Accordingly, any amounts paid over and above the $3,783.00 per month owed under the Final

Support Judgment constitute an advance on the community.[25]

### D.  Bankruptcy and Partition Hearing

On April 27, 2018, Hank Ton filed a Voluntary Petition under Title 11 Chapter 11 of the

United States Code.[26]

---

[20] *See* Exhs. A3, A5.
[21] Exh. A5.
[22] *Id.*
[23] Stip. 7; Exh. A20.  This amount is "running from the date Ms.  Ton's rule for permanent spousal support was filed, and due on the first day of each month." *Id.*  at 2.
[24] *Id*. at 2.
[25] *Id*.
[26] Case No. 18-11101, P-1.

On October 8, 2018, Lynda Ton removed the Partition Petition to the United States District Court for the Eastern District of Louisiana. On October 15, 2018, the District Court referred the partition proceedings to this Court.[27]

### E. Assets of the Former Community

The Parties have stipulated to the following values regarding the former community property:

COMMUNITY ASSETS

**COMMUNITY BUSINESSES**

| | | |
|---|---|---|
| • | Abe's | No stipulation |
| • | B&H (51% membership interest) | $105,509.00[28] |
| • | Mardi Gras Central (100% membership) | $67,000.00[31] |
| • | Stock in Gulf Wells | $104,061.00[32] |
| • | Stock in Heather Marine | $ 0-[33] |
| • | Magnolia Outdoor Outfitters | $ 0- [34] |
| | Total Value of Community Businesses | $276,570.00 |

**IMMOVABLE PROPERTY**

| | | |
|---|---|---|
| • | 9087 Highway 23 Parcel #1345900 | $960,000.00[35] |
| • | 9297-9299 Highway 23 Parcel #1075000 | $320,000.00[36] |
| • | 1079-80 Bullock Road ("Bullock") [Parcel #s 900632, 900633, 900646, 900647, 900648-D] | $1,020,000.00 |
| • | MS Property Parcel # 900648-C | $320,000.00[37] |

---

[27] Case No. 18-11101, P-115.
[28] Stip. 20.
[31] Stip. 21.
[32] Stip. 19.
[33] Stip. 23.
[34] Stip. 24.
[35] Stip. 18; Exh. B19.
[36] Stip. 17; Exh. B18.
[37] Stip. 12; Exh. B13.

- 115 Battistella Parcel # 1505975        $9,050.00[38]
- 137 Battistella Parcel # 1187950        $265,000.00[39]
- 33066 Highway 11 ("former Petrovich property")

  Parcel # 1401700        $9,500.00[40]
- 299 Sarah Victoria ("Matrimonial Domicile")        $370,000.00[41]
- 1500 Emerald Coast Boulevard (Silver Shell,

  St. Thomas—Unit 808) ("Destin Condo")     $1,200,000.00[42]

  - *2017 Property Taxes*     *<$14,155.57>[43]*
  - *2018 Property Taxes*     *<$11,953.83>[44]*
  - *Realtor's Commissions*     *<72,000.00>*
  - Total     $1,173,890.60

## MOVABLE PROPERTY

- 2009 Dodge Challenger        $19,800.00[45]
- Boat (2007 23 ft. Bombardier)        $21,295.00[46]
- Jet ski & Trailer        $4,500.00[47]
- 1968 Camero        $45,000.00[48]
- 1971 Ford Mustang        $25,000.00[49]
- 2005 FLHTCI Electra Glide Motorcycle        $8,500.00[50]

---

[38] Stip. 14; Exh. B15.
[39] Stip. 15; Exh. B16
[40] Stip. 15; Exh. B17.
[41] Stip. 8; Exh. B1.
[42] Stip. 9.
[43] Stip. 10.
[44] *Id.*
[45] Stip. 24; Exh. C1.
[46] Stip. 31; Exh. C7.
[47] Stip. 32.
[48] Stip. 25; Exh. C2.
[49] Stip. 26; Exh. C3.
[50] Stip. 27; Exh. C4.

- 2010 ZX1400 Ninja Motorcycle                         $6,500.00[51]
- 2005 Bourget Fat Daddy Motorcycle                    $15,000.00[52]
- 2005 Bourget Low Blow Chopper Motorcycle             $15,000.00[53]
- Retirement Accounts (balance remaining in community
  accounts when stips filed)                           $16,377.00[54]

Total value of movable property                         $176,972.00

## F. Alienation of Former Community Property

Hank Ton liquidated or received the following community assets:

| | |
|---|---|
| Whitney Checking Account #1224 | $18,040.00[55] |
| Ameriprise Trust Plan Account #4133 | $96,933.00[56] |
| Prudential Life Insurance Account Policy | $263,924.12[57] |
| Wells Fargo Advisors Prudential Annuity Account #6285 | $173,856.00[58] |
| Stifel Account #5834 | $70,676.00[59] |
| Whitney Money Market Account | $213,486.00[60] |

---

[51] Stip. 28; Exh. C5.
[52] Stip. 29; Exh. C6.
[53] Stip. 30.
[54] Stip. 33.
[55] Stip. 36.
[56] Stip. 37.
[57] Exh. D3.
[58] Stip. 38.
[59] Stip. 39.
[60] Stip. 40.

In addition, Hank Ton liquidated a Prudential Life Insurance Policy ("Policy") for $263,924.12.[61] Hank Ton advanced the Policy's proceeds to Abe's, and Abe's credited Hank Ton's loan account.[62]  Abe's utilized the funds:

1. Payment of 2015 property taxes for seven (7)  vessels, $100,000.00;[63]
2. Satisfaction of outstanding invoices to Shipyard Service, LLC for repairs on the M/V "Miss Wynter," $19,000.00;[64]
3. Payment of outstanding invoice owed to Arthur J.  Gallagher Risk Management Services, Inc. for hull insurance on vessels, $29,158.30;[65]
4. Satisfaction of outstanding invoice owed to Hardrock Marine Service, LLC, $32,963.93;[66]
5. Hull insurance, $21,688.52;[67]
6. Payment of outstanding invoices owed to United Power Systems, LLC for inspection and repair of engines and other necessary repairs and maintenance for "M/V Ruth," "M/V Dutch Girl," and "M/V Capt.  Jason," $18,230.02;[68]
7. Installment payment to BankDirect Capital Finance on for insurance premium financing agreement, $39,044.41;[69]
8. Remaining funds held by Abe's, $3,838.94.

Finally, Hank Ton placed security interests in favor of Whitney and encumbering certain real property owned by the former community:

1. A Deed of Trust dated September 26, 2013, and modified December 16, 2013, recorded in the records of Pike County, Mississippi,  and encumbering Bullock, which is titled in the name of Hank Ton;[70] and
2. A Mortgage dated September 23, 2013, recorded in Okaloosa County, Florida and encumbering a certain parcel of property described as Unit 808, St. Thomas at Silver Shells, Okaloosa, Florida, titled in the names of Hank and Lynda Ton ("Florida Condo").[71]

---

[61] Stips.  44–45; Exh.  D3.
[62] P-44 at ¶¶ 5–7.
[63] Exh. D3 at 15–23.
[64] *Id.* at 24.
[65] *Id.* at 26, 29.
[66] *Id.* at 30–31.
[67] *Id.* at 26–28, 32–35.
[68] *Id.* at 48–62.
[69] *Id.*
[70] Stip. 11; Exh.  F1 at exhibit 5.
[71] Stip. 9; Exh.  B3.

### G.  Whitney Debt

Whitney made a total of five (5) loans to Abe's[72] all guaranteed by Hank Ton.[73]  Through refinancings and loan consolidations, the five (5) loans have been reduced to two (2) outstanding notes.[74]

Whitney funded Loan 1 on August 16, 2011 in the amount of $1,822,462.00.[75]  On May 8, 2012, it was renewed for $3,209,234.00.[76]

On May 29, 2013, Whitney advanced Abe's $3,222,451.00 to partially satisfy the Restitution Judgment ("Loan 2").[77]

On September 23, 2014, a new loan  paid off Loan 2 and advanced Abe's $2,985,184.80 as a Non-Revolving Line of Credit ("Loan 3").[78]

On November 10, 2014, Loan 4 was extended to Abe's in the amount of $410,000.00.[79]  On January 4, 2015, Loan 5 in the original principal amount of $6,105,010.79,[80] consolidated Loans 1 and 4 and advanced additional funds of $3,682,855.85.[81]  At the time, Loan 4 had a balance of $412,072.77 and Loan 1 a balance of $2,010,082.17.[82]

All the loans are secured by assets of Abe's and former community real property located in the states of Mississippi and Florida.

---

[72] Exhs. W1–W5.
[73] Stips. 70–71; Exh. F1 at 6.
[74] *See* Exhs. W1–W5.
[75] Exh. W1.
[76] *Id*.
[77] Stip. 67; Exhs.  F1–F2, W2.
[78] Exh. W3.
[79] Exh. W4.
[80] Exh. F1, Whitney Proof of Claim 8-1, Part 2 at 5.
[81] *Id*.
[82] Exh.  W5.

11

Loans 1 through 5 (collectively "Whitney Claims") were carried as obligations on Abe's balance sheet.

## II.  LEGAL ANALYSIS

When the community regime is terminated, property comprising the community is no longer considered "community property;" instead, it is referred to as "former community property."[83] This term applies even before a court partitions the property.  La. C.C. art. 2369.2 provides, "Each spouse owns an undivided one-half interest in former community property and its fruits and products." Thus, former community property comprises: (1) property acquired during the existence of the community regime through the efforts of either spouse; (2) property acquired with community property; and (3) the fruits or products from property.[84]

La.  R.S. 9:2801 provides the process for partitioning former community property when the spouses are unable to agree.[85]   First, the court must classify the property as community or separate and establish the value of each community asset and liability.[86]  Next, the court totals all advances taken from community assets and community debts satisfied from separate property to calculate if either spouse is due reimbursement.[87]  Last, the court divides the community assets and liabilities so that each spouse receives property of equal net value.[88]  A court has broad discretion regarding

---

[83] La. C.C. art. 2369.1.

[84] La. C.C. art 2341.

[85] La. R.S. 9:2801A:

> When the spouses are unable to agree on a partition of community property or on the settlement of claims between the spouses arising either from the matrimonial regime, or from the co-ownership of former community property following termination of the matrimonial regime, either spouse, as an incident of the action that would result in a termination of the matrimonial regime or upon termination of the matrimonial regime or thereafter, may institute a proceeding, which shall be conducted in accordance with the following rules: . . .

[86] *Id.* at 9:2801A(4)(a).

[87] *See id.*

[88] La. R.S. 9:2801A(4)(b):

> The court shall divide the community assets and liabilities so that each spouse receives property of an equal net value.

12

the partition of community property.[89]  It may divide an asset equally or allocate the entire asset to one of the spouses.[90] If, however, the allocation or division causes an unequal net distribution, then the court may order the spouse with more to make an equalizing monetary payment.[91]  When dividing assets, the court may consider each spouse's economic condition as well as any other conditions that the court deems relevant.[92]

The following results from the partition of former community property:

(1) [T]he spouses cease to be co-owners of the former community property; (2) the former community assets are divided into separate portions or lots; (3) each former spouse becomes the exclusive owner of a separate portion or lot of the divided assets; and (4) the assets of which each former spouse acquires sole ownership are reclassified by law as the separate exclusive property of that former spouse.[93]

## A.  Characterizing Assets and Debt

In this case, the Parties do not dispute which assets comprise the former community.  Instead, the Parties disagree as to the nature, community or separate, of some obligations imposed against community assets or incurred by community businesses.  Resolution of this dispute will affect the value of former community assets as well as the Parties' claims for reimbursement.

---

[89] *Smith v.  Smith*, 95–0913 (La. App. 1 Cir 12/20/96); 685 So.2d 649, 655.

[90] La.  R.S. 9:2801A(4)(c) states:

    The court shall allocate or assign to the respective spouses all of the community assets and liabilities. In allocating assets and liabilities, the court may divide a particular asset or liability equally or unequally or may allocate it in its entirety to one of the spouses. The court shall consider the nature and source of the asset or liability, the economic condition of each spouse, and any other circumstances that the court deems relevant. As between the spouses, the allocation of a liability to a spouse obligates that spouse to extinguish that liability. The allocation in no way affects the rights of creditors.

[91] La.  R.S. 9:2801A(4)(d) states:

    In the event that the allocation of assets and liabilities results in an unequal net distribution, the court shall order the payment of an equalizing sum of money, either cash or deferred, secured or unsecured, upon such terms and conditions as the court shall direct. The court may order the execution of notes, mortgages, or other documents as it deems necessary, or may impose a mortgage or lien on either community or separate property, movable or immovable, as security.

[92] La.  R.S. 9:2801A(4)(c).

[93] *Anderson v. Conine (In re Robertson)*, 203 F.3d 855, 860 (5th Cir.  2000).

13

Lynda Ton objects to the inclusion of Whitney Claims in (1) the calculation of Abe's value; or (2) against the community either as secured or contingent debt arising through Hank Ton's guaranty.  She objects to the inclusion of Whitney Claims in calculating Abe's value because (1) debt acquired after February 2013 violates the February and August Consent Orders; (2) debt was used to acquire new vessels without her consent; and (3) debt repaid Hank Ton's separate and personal obligations.[94]

### 1. Whitney Claims and the Valuation of Abe's

The Whitney Claims[95] are now represented by two (2) outstanding notes.[96]  The history of Whitney Claims affects the outcome of this issue.

Whitney funded Loan 1 on August 16, 2011 for $1,822,462.00.[97]  On May 8, 2012, Whitney renewed it for $3,209,234.00.[98]

On May 29, 2013, Whitney advanced  Abe's $3,222,451.00  to partially satisfy the Restitution Judgment. ("Loan 2").[99]

On September 23, 2014, a new loan paid off Loan 2 and advanced Abe's $2,985,184.80 as a Non-Revolving Line of Credit ("Loan 3").[100]

On November 10, 2014, Whitney extended Loan 4 to Abe's in the amount of $410,000.00.[101]

---

[94] P-42 at 30–36.
[95] Exhs. W1–W5.
[96] *See* Exhs. W1–W5.
[97] Exh. W1.
[98] *Id.*
[99] Stip. 67; Exhs.  F1–F2, W2.
[100] Exh. W3.
[101] Exh. W4.

On January 4, 2015, Loan 5 in the original principal amount of $6,105,010.79[102] consolidated
Loans 1 and 4 and advanced additional funds of $3,682,855.85.[103]  On the date of consolidation,
Loan 4's  balance was $412,072.77 and Loan 1's balance was $2,010,082.17.[104]

Loans 2, 3, and 4 were issued after the institution of the Divorce Proceedings.  Loans 3, 4, and
5 were issued after the Divorce Judgment.

Abe's assets and the former community's real property located in the states of Mississippi
and Florida secure the loans.

Because Abe's carried Loans 1 through 5 as obligations on its balance sheet, they contribute
to Abe's negative net worth of -$1,015,620.00.[105]

### a) Alleged Violations of the August and February Consent Orders

Pending the community partition, Hank Ton, as Abe's sole, registered shareholder and
president, managed the business.  While the Divorce and Partition Petitions were pending, Abe's
acquired several vessels, refinanced and incurred new bank debt, and paid the Restitution
Judgment.[106]  Lynda Ton avers that the Whitney Claims should be excluded in the Abe's valuation
because Abe's violated the 25th JDC Consent Orders which prohibit encumbering community assets
and acquiring debt pending the partition of the former community.[107]

---

[102] Exh. F1, Whitney Proof of Claim 8-1, Part 2 at 5.
[103] *Id*.
[104] Exh. W5.
[105] P-43 at 22; Exh.  G1.
[106] P-42 at 29–46.
[107] *Id.*

The August Consent Order provides in relevant part:

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that an Injunction shall issue herein, directed to the parties, their agents and assigns, prohibiting them from alienating, encumbering, wasting, disposing of, transferring, concealing, or damaging any assets of the parties, the nature of which may be disputed as to whether community or separate to include the changing of any beneficiaries on any policies or accounts, and disposal of any property of the parties, without court order or written consent of both parties.[108]

The February Consent Order states in pertinent part:

**IT IS ORDERED, ADJUDGED, AND DECREED** that there is permanent injunction should issue, directed to the Hendrikus Ton, his agents and/or assigns prohibiting him, his agents and assigns from alienating, transferring, selling, wasting, liquidating, or otherwise disposing of any or all of the assets of the parties or any property, the nature of which may be disputed as to whether separate or community. This injunction includes but is not limited to liquidating any assets owned by the following community businesses ABE'S BOAT RENTALS, INC, B&H MARINE TRANSPORTATION SERVICES, LLC, GULF WELLS, INC and MARDI GRAS CENTRAL, L.L.C.

**IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that in the event Hendrikus Ton, as representative/operator of the community businesses, through the ordinary scope and customary with his the business needs to sell an asset owned by a community businesses, he will do the following:
   1. Notify Linda Ton through counsel within 3 days of his actual intent to sell a boat.
   2. File with the Court to set an expedited hearing to acquire authorization from the Court through a contradictory hearing to sell such an asset.
   3. Mr. Ton shall deposit any proceeds from any sale of any of the assets referenced herein to the registry of the Court in the above captioned matter. Any disbursement of such deposited funds will released only after a contradictory hearing and an order of the Court.[109]

Nothing in either Order prohibits Abe's from borrowing funds, encumbering its assets, or

acquiring new assets. Although the August Consent Order prohibits the former spouses from

---

[108] Exh. A3.
[109] Exh. A5 at 1–2.

16

"[A]lienating, encumbering, wasting, disposing of, transferring, concealing, or damaging any assets of the parties," the assets of Abe's are not community property.

Lynda Ton argues that as a community business, Abe's assets are community property.[110] She relies on *State Bank &Trust Co. of Golden Meadow v. Boat "D.J. Griffin"*[111] and *Rosbottom v. Schiff (In re Rosbottom).*[112] *Rosbottom* has no precedential value because it is an unpublished decision.[113] *State Bank* is also inapplicable.

In *State Bank*, the ex-spouses owned Derris Griffin Boat Operators, Inc. ("Griffin Boat"). During their divorce proceedings, Derris Griffin mortgaged Griffin Boat's assets. His ex-wife challenged the encumberance as a violation of La. C.C. art 2369.4, which prohibits the alienation of a community asset during a divorce proceeding without both spouses' consent or a court order.[114]

The *State Bank* Court ultimately voided the mortgage because it violated a resolution of Griffin Boat's board of directors and was therefore unauthorized. Notably, the mortgage was not cancelled because it violated La.C.C. art 2369.4.[115]

Nevertheless, Lynda Ton points to language in the opinion which declares Griffin Boat's assets to be community assets because the community owned the company itself.[116] This language is merely *dicta* because it is not necessary to the Court's findings or ruling. It is also worth noting

---

[110] P-42 at 31.
[111] 755 F.Supp. 1389, 1397 (E.D. La. 1991) (holding that the companies' assets were community property and each spouse owned an undivided one-half interest in the assets when the several companies were formed and incorporated during the existence of the marriage).
[112] No. 16-31108 (5th Cir. 2017). The *Rosbottom* opinion was unpublished pursuant to 5th Circuit Rule 47.5. Therefore, it may not be used as precedent except under the limited circumstances set forth in 5th Circuit Rule 47.5.
[113] The substance of *Rosbottom* concerned a mortgage placed on community property located in Louisiana. Pursuant to La. C.C. art. 2369.4 a mortgage encumbering community property if not signed by both spouses is a relative nullity. This is not the law in Florida. *See Hamilton v. Hughes*, 737 So.2d 1248 (Fla. 5th DCA 1999). For further discussion, see p. 29.
[114] *See* La. C.C. 2369.4.
[115] *State Bank & Trust*, 755 F.Supp. at 1399–1400.
[116] *Id.* at 1397.

17

that the statement is clearly at odds with Louisiana law which holds that a validly formed corporation's assets are not its shareholders' personal property.[117]

Accordingly, only the ownership interest in Abe's (Hank Ton's stock) is a community asset. Therefore, Abe's and Hank Ton did not violate the August Consent Order's terms by acquiring assets, incurring debt, or granting security interests in favor of Whitney without Lynda Ton's consent.

As to the February Consent Order, it prohibits the sale of assets owned by Abe's without Lynda Ton's consent. Again, acquiring assets, borrowing funds or refinancing debt, and granting security interests do not violate this Order's terms.

The Court concludes that neither acquiring new vessels, additional credit, the granting of security, nor refinancing existing debt violates the Consent Orders.

### b) Abe's Failure to Secure Lynda Ton's Consent

Lynda Ton avers that the Court should not consider the Whitney Claims when valuing the community's interest in Abe's because the debt was incurred without her consent. She relies on La. C.C. art. 2369.4 because it prohibits the alienation of community assets during a pending divorce and partition.[118] For the reasons already stated, nothing in the marriage, divorce, or partition laws, nor Orders of the 25th JDC require Abe's to obtain Lynda Ton's consent to borrow funds, refinance debt, encumber or acquire assets.

---

[117] *See* La. C.C. art. 24 and cmt. (d); *Levert v. Shirley Planting Co.*, 66 So. 301 (La. 1914).
[118] *See* La. C.C. art. 2369.4.

18

Further, Lynda Ton raises no claim of defect in the form or execution of the Whitney Claims and security interests. In fact, this Court entered an Order in the Abe's bankruptcy proceeding allowing the Whitney Claims as valid and enforceable.[119]

### c) Allegations that Abe's Satisfied a Separate, Personal Obligation

Lynda Ton complains that the Court should exclude a portion of the Whitney Claims in calculating Abe's value because the loans were used to satisfy personal and separate obligations of Hank Ton not owed by the company.

From 2006 through 2009, Hank Ton, in his capacity as Abe's president, failed to report wages for Abe's employees to avoid payroll tax liabilities.[120]  As a result, Abe's did not withhold payroll tax deductions from individual wages, nor did it pay the employer's matching payroll tax to the IRS.[121]

The IRS investigated and ultimately charged Hank Ton with criminal tax fraud.[122]  The indictment alleged that, except for Hank Ton, all individuals working for Gulf Wells and B&H Marine were Abe's employees for payroll and tax purposes.[123]  It also alleged that *the company and Hank Ton* conspired to conceal the true employment status of these persons to evade payment of matching payroll taxes.[124]  In the Plea Agreement, Hank Ton admitted to the charges and agreed to

---

[119] Case No.  18-11102, Adv.  No.  19-1071.
[120] Exh.  F8 at 2–4.
[121] *Id*.
[122] Exh.  F6.
[123] *Id*.  at 2.
[124] *Id*.  at 3–4, 8.

pay criminal restitution in the amount of $3,582,451.92.[125]   That sum includes the taxes owed by both Abe's and the employees.[126]  Abe's satisfied this amount in large part through Loan 2.[127]

Hank Ton was charged for Abe's liability because he was a "responsible person"[128] under 26 U.S.C. § 7202[129] of the United States Tax Code.  As a responsible party, Hank Ton was obligated to the government for the satisfaction of the employment taxes jointly and severally with Abe's.[130]  As a result, the Restitution Judgment was a valid obligation of Abe's properly satisfied by the company through an advance made by Whitney.  It is correct to consider the Restitution amount, now incorporated into the Whitney Claims, when valuing Abe's.

---

[125] Exh.  F7.

[126] Exhs.  F8, F11.

[127]  The funds advanced for Loan 2 did not completely satisfy the Restitution Judgment.  For purposes of this Opinion, the Court has applied them to the Restitution amounts.

[128] *Reid v. United States*, 558 F. Supp. 686, 688—89 (N.D. Miss. 1983) ("It is to be noted that liability is secondarily shifted to the 'responsible person' as a method 'whereby the government can collect . . . the taxes that the corporate employer withheld and should have accounted for and paid over.'") (quoting *Hartman v. United States*, 538 F.2d 1336, 1340 (8th Cir. 1976)).

[129] I.R.C. § 6672(a) applies the same language as § 7202, but imposes civil penalties on "any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax."  Further, the Supreme Court held that § 6672(a) applies to corporate officers or employees responsible for the collection and paying over of withholding taxes.  *Slodov v.  U.S.*, 436 U.S. 238, 244–45 (1978).  Although the *Slodov* Court made the holding based on § 6672(a), it stated that persons civilly liable could be held criminally liable under § 7202.  *Id.*  at 245, 247.

[130] *Brown v. U.S.*, 591 F.2d 1136, 1142 (5th Cir. 1979) ("While the penalty imposed by section 6672 is distinct from and not in substitution of the liability for taxes owed by the employer, it brings to the government only the same amount to which it was entitled by way of the tax.")(internal quotations omitted)(quoting *Newsome v. United States*, 431 U.S. 742, 745 (5th Cir. 1970)); *see also Hartman v. United States*, 538 F.2d 1336, 1340 (8th Cir. 1976)(holding that "while two or more persons may be jointly and severally liable under § 6672, the government is not entitled to more than one satisfaction of the tax liability owed to it"); *see also Reid v. United States*, 558 F. Supp. 686, 688—89 (N.D. Miss. 1983) (believing "that a 'responsible person' . . . is entitled to indemnity from the employer to the extent the employer's tax liability is reduced. . . . The responsible person is not penalized for active or affirmative wrongdoing, but is merely used as a tax collection device. Therefore, the parties are not jointly and severally liable nor in *pari delicto* under the statutory scheme, nor should the 'responsible person' be barred from seeking indemnity from the primary obligor. It is proper that indemnity be used as an equitable device to assure complete justice by shifting responsibility from the 'responsible person' back to the employer upon whose shoulders rests the original obligation.") (citing W. Prosser, *Handbook on the Law of Torts*, § 51 (4th ed. 1971)).

## 2.  *Valuation of Abe's*

Having determined that the Whitney Claims are properly included as Abe's obligations, the next step is to value the Parties' equity interests in Abe's.[131]  No set formula exists to determine a business' value for a community property partition.[132]  Moreover, an expert's testimony as to a business' value depends on the expert's professional qualifications, experience, and most importantly the facts the expert relied on to develop his opinion.[133]

At trial, Hank Ton admitted the expert report of Malcolm Dienes[134] to support his calculation of Abe's value.[135]  Dienes used Abe's December 31, 2018, balance sheet[136] and relied on vessel surveys from August 11, 2018, to value the vessels at \$7,281,250.00[137] and Abe's total assets including vessels at \$10,139,549.00.[138]

Dienes found Abe's liabilities to be \$11,155,169.00.[139]  Dienes' report assigns Abe's a negative equity value of  -\$1,015,620.00 and its fair market value of zero dollars.[140]

Lynda Ton disagrees with this valuation.[141]  She values Abe's at \$2,100,000.00 based on marine surveys not admitted into evidence.[142]

---

[131] *See, e.g., Ellington v. Ellington*, 36,943 (La. App. 2 Cir. 2/18/03); 842 So.2d 1160, 1166, *writ denied,* 2003-1092 (La. 6/27/03); 847 So. 2d 1269 ("If the community asset to be valued is an interest in a partnership or corporation, the court must be careful to value the interest, not just the assets of the business entity.").

[132] *Landry v.  Simon*, 98-1386 (La. App. 3 Cir. 3/17/99); 732 So.2d 587, 588–89.

[133] *Id.*  at 589 (citing *Head v.  Head*, 30-585 (La. App. 2 Cir. 5/22/98); 714 So.2d 231).

[134] Lynda Ton accepted Dienes as a business valuation expert with the stipulation that if the representative of Dienes, present at trial, testified, he would have testified as is stated in the Dienes report.  *See* P-36 at 4.

[135] Exh.  G1.  ("Fair Market Value is defined as the price at which a property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.") (citing Valuing a Business, Fifth Edition by Shannon P.  Pratt with Alina V.  Niculita, p.47).

[136] *Id.*  at 2.

[137] *Id.*  at 4.

[138] *Id.*  at 4.

[139] *Id.*  at 6.

[140] *Id.*

[141] Trial Testimony ("TT") Lynda Ton.

[142] *Id.*

Lynda Ton's omission of the Whitney Claims accounts for the difference between Dienes' value and that of Lynda Ton. Since the Court ruled the Whitney Claims are valid obligations of Abe's, it accepts Dienes' value of zero. However, for purposes of this Opinion, that value will be adjusted as explained below.

## B. Characterizing and Valuing Community Liabilities

The Parties dispute which liabilities are community liabilities and the corresponding amount of debt owed. There is a rebuttable presumption that any debt incurred during the community property regime's existence is a community obligation.[143] In this case, the Parties do not dispute that the debts incurred prior to the Divorce Petition's filing are community obligations. Instead, their dispute concerns obligations arising after the Divorce Petition's filing.

La. C.C. art. 2360 defines a community obligation as "[a]n obligation incurred by a spouse during the existence of a community property regime for the common interest of the spouses or for the interest of the other spouse . . ." In contrast, under La. C.C. art. 2363, a "separate obligation" is:

> [O]ne incurred by that spouse prior to the establishment of a community property regime, or one incurred during the existence of a community property regime though not for the common interest of the spouses or for the interest of the other spouse.

### 1. The Whitney Guaranty

Normally, including the Whitney Claims in the calculation of Abe's value would end any consideration of the debt in relation to the community; having been provided for once, a court would not need to include the debt in the partition. However because Abe's net worth is actually

---

[143] La. C.C. art. 2361.

negative,[144] a shortfall in Abe's repayment to Whitney may result in a claim against Hank Ton under his guaranty.[145]

Although Abe's filed for bankruptcy relief on April 27, 2018,[146] the personal disputes between Hank and Lynda Ton have hampered Abe's ability to formulate a plan of reorganization. Therefore, at this juncture, the Court is unable to determine with any degree of certainty what, if any, liabilities Abe's cannot satisfy.

Abe's most recent plan of reorganization, filed on May 15, 2019, proposes to satisfy all Whitney Claims through post-confirmation operations.[147] Abe's values Whitney's collateral interests at $6,907,500.00 [148] based on the total value of vessels encumbered by First Preferred Ship Mortgages in favor of Whitney.  According to the proof of claim filed by Whitney in Abe's bankruptcy case, the Whitney Claims have an outstanding balance of $9,533,579.00 as of April 27, 2018.[149]  In addition, this Court presided over Abe's request for the use of Whitney's cash collateral. According to the Order entered in connection with that request, Whitney holds a debt of not less than $9,515,535.53 secured by Abe's equipment, inventory, accounts, and general intangibles as well as certain preferred ship mortgages dated July 10, 2008; February 13, 2012; May 8, 2012; May 29, 2013; January 5, 2015; January 1, 2016; and June 1, 2016.[150] Thus, it appears that Whitney is undersecured, but other Abe's assets may reduce its deficiency.

---

[144] P-43 at 22; Exh.  G1.
[145] P-43 at 8, 11–15, 22; Exh.  F1, Whitney PoC 8-1.
[146] Case No.  18-11102.
[147] Case No.  18-11102, P-382 at 10–14.
[148] Case 18-11102, P-383 at 16.
[149] *Id.*
[150] Case No.  18-11102, P-173 at ¶3.

Given Abe's precarious financial state and negative net worth, it seems likely that Hank Ton's guaranty will be called to satisfy a portion of the Whitney Claims.  Because of this potential, the Court must consider the characterization of that guaranty as separate or community debt.

Lynda Ton argues that the guaranty is not a community obligation because it was incurred (1) in violation of the Consent Orders; (2) after the Divorce Judgment; and (2) in partial satisfaction of a separate obligation, the Restitution Judgment.

### a) The Febru`ary Consent Order

Again, the Consent Orders prohibits "alienating, transferring, selling, wasting, liquidating, or otherwise disposing of any or all of the assets of the parties or any property."[151]  This Order's plain language does not prohibit Hank Ton from incurring an obligation.

### b) The Novation or Satisfaction of Community Debt

Loans 2, 3, 4, and 5 were all executed after the Divorce Petition was filed on November 14, 2012.[152]  All advanced new money to Abe's and/or refinanced prior loans.[153]  Loan 5 paid off Loans 1 and 4, while Loan 3 paid off Loan 2.[154]  As of today, only Loans 5 and 3 remain outstanding.[155]

Lynda Ton argues that, under Louisiana law, the refinancing of Loans 1 and 4 into Loan 5 and Loan 2 into Loan 3 extinguished the former community's obligation because performance (payment in full of Loans 1, 2, and 4) was completed.[156]  Moreover, she asserts that when Abe's

---

[151] Exh.  A5.
[152] Exhs.  A1, W2–W5.
[153] *Id.*
[154] Exhs.  W3, W5.
[155] Exh.  F1.
[156] P-42 at 32; *see also* La. C.C. arts. 1854, 1857.

executed the new note evidencing Loan 5, at least to the former community, this was a novation of

a previously existing community debt.[157]

Hank Ton argues that although the refinancings and credit extensions occurred after

Termination, Abe's incurred Loan 3 during the pendency of the divorce proceedings, and Abe's

incurred both Loans 3 and 5 in connection with Hank Ton's fiduciary responsibilities to manage the

community.[158]

A community obligation is incurred during the existence of the community regime.[159] When

a judgment of divorce is entered, it terminates the community retroactively to the petition for

divorce's filing date.[160] Therefore, upon the filing of a petition for divorce, a gap period arises

during which debts incurred and property acquired maintain a fluid status.  If a judgment of divorce

is entered, they are considered separate in nature, although an ex-spouse may seek reimbursement

for the satisfaction of community debt.[161]

At least one court has held that the obligation to prudently manage former community

property does not "appl[y] to the classification of an obligation as community or separate or to the

valuation of that asset or liability."[162] In *Benoit v. Benoit*, a spouse took additional draws on a line

of credit subsequent to the community's termination.  The Court found that the additional draws

constituted a separate obligation, and only the credit line's balance at the time of termination was

a community debt.[163] In *Clemons v. Clemons,* the Court held that following termination, a spouse's

---

[157] *Id*.  (citing La.  C.C. art.  1881; *White Co.  v.  Hammond Stage Lines*, 180 La.  962, 158 So.  353 (La. 1934)).
[158] P-43 at 9-15.
[159] La. C.C. art. 2360.
[160] La. C.C. art. 2356.
[161] La. C.C. art. 2364.
[162] *Benoit v.  Benoit*, 2011–0376 (La. App. 1 Cir. 3/8/10); 91 So.3d 1015, 1024 (emphasis in original).
[163] *Id*.

conversion of a community line of credit to a permanent loan and its subsequent refinancing did not transform the true nature of the original debt.  As a result, the Court classified the refinanced debt as a community obligation.[164]  This case involves a hybrid of the circumstances existing in *Benoit* and *Clemons.*

The increase in Hank Ton's obligations under the guaranty after the entry of the Divorce Judgment is factually similar to *Benoit.*  The new advances made under Loans 3, 4, and 5 were not only made after the retroactive date of the community regime's termination, but after the entry of the Divorce Judgment.[165]  Like the additional draws on the credit line in *Benoit*, the new advances are Hank Ton's separate obligation and total $7,078,040.65.[166]

The guaranty of Loan 1 was given during the community to assist a community company. As such, it is presumed to be a community obligation.  However, Loan 1 was refinanced into Loan 5 after the Divorce Judgment was rendered.  Like *Clemons*, Loan 1's balance can be traced to a portion of the balance created under Loan 5.  However, unlike *Clemons*, Loan 1 was combined with Loan 4 and a new advance when Loan 5 was made.  This is more than the mere issuance of a new note or refinancing of the Loan 1 debt.

---

[164] *Clemons v. Clemons*, 42–130, p. 5 (La. App. 2 Cir. 5/9/07); 960 So.2d 1068, 1072.
[165] The Divorce Judgment was entered on August 5, 2013, and Termination occurred November 14, 2012.  Exhs.  1, 2.
[166] Loan 3 advanced $2,985,184.80 on 9/23/2014; Loan 4 advanced $410,000 on 11/10/15; and Loan 5 advanced $3,682,855.85 on 1/4/15.  Because the Court assigns the ownership of Abe's to Hank Ton and its value contemplates the repayment of these debts, Hank Ton will benefit from the Loans.

La. C.C. art. 1881 states:

Novation takes place when, by agreement of the parties, a new performance is substituted for that previously owed, or a new cause is substituted for that of the original obligation.  If any substantial part of the original performance is still owed, there is no novation . . . Mere modification of an obligation, made without intention to extinguish it, does not effect a novation.  The execution of a new writing, the issuance or renewal of a negotiable instrument, or the giving of new securities for the performance of an existing obligation are examples of such a modification.

The comments to art. 1881 make clear that novation is not favored in the absence of a clear indication that a new obligation has been contracted and the original extinguished.[167]  In this case, Loan 5 extinguished the notes represented by Loans 1 and 4.  Whitney admits that only the notes associated with Loans 3 and 5 are outstanding.  Thus, the execution of Loan 5 novated the community guaranty of Loan 1.

Nevertheless, while the guaranty of Loan 1 is no longer a community debt, Hank Ton is due a reimbursement claim for its conversion to separate debt.

This leaves the "gap" advance or Loan 2 made to partially satisfy the Restitution Judgment. Loan 2 could be characterized as either separate or community while the divorce was pending, but after Termination, obligations incurred during the gap period are considered separate.  Although when a spouse incurs debts after termination of the community, he is not automatically disqualified from seeking reimbursement for half of the amounts so long as he incurred them while fulfilling his statutory duty[168] to preserve the former community property under his control.[169]

---

[167] *See* La. C.C. art. 1881 cmt. (a) and *Weeks Supply Co.  v.  Werdin*, 147 So. 838 (La. App. 2 Cir. 1933).
[168] *See* La. C.C. art.  2369.3.
[169] *Hatsfelt v. Hatsfelt*, 2005-0947 (La. App. 3 Cir. 2/1/06); 922 So.2d 732, 736.

Hank Ton argues that paying the Restitution Judgment was in Lynda Ton's interest because it satisfied a community business debt.[170] Further, it relieved the business from the risk of government seizure had the IRS elected to collect the debt.

Although Hank Ton's argument is probably true, the Court cannot overlook that Hank Ton's direct actions needlessly increased Abe's liabilities. A spouse may incur separate obligation during the existence of the community property regime if it is not for the spouses' "common interest" or if the obligation arises from an "intentional wrong ... to the extent that it does not benefit both spouses, the family, or the other spouse."[171] Hank Ton engaged in criminal tax fraud.[172] By concealing employees from the IRS, Abe's failed to collect the employees' portion of payroll taxes they owed. As a result, under the Internal Revenue Code, Abe's liability increased for their share. The increase amounts to 50% of the tax assessed or $1,611,225.50. The other 50% represents payroll taxes Abe's owed as the employer for tax years 2006 through 2009. While the liability for these taxes was incurred during the existence of the community, it was not owed under the Whitney guaranty until after the Termination. As a result, it too is separate. The Court also notes that the IRS has filed a Proof of Claim in this case for $968,440.88 in interest accrued on the Restitution. Those are additional damages arising from Hank Ton's conduct and separate in nature. Had Hank Ton not committed tax fraud, no interest would be due.[173]

As of April 27, 2018,[174] the balance on Loan 3 was $4,111,194.61 and on Loan 5 $5,404,340.92.[175] Due to payments already being made on the Loans, the Court will allocate the

---

[170] P-43 at 12-15.
[171] La.C.C. art. 2363.
[172] Exhs. F6-11; Stip. 69.
[173] This is not on Abe's balance sheet, so no adjustment to net worth is necessary.
[174] This is the date Hank Ton and Abe's filed their bankruptcy petitions.
[175] Exhs. W3, W5.

balances based on the ratio of former community or reimbursement debt to separate debt outstanding on the date each loan was executed.

### c) Security interests in the Mississippi and Florida Properties

Lynda Ton objects to the security agreements on real property placed on the Mississippi parcel and the Florida Condo.[176]  She alleges that the encumberance of these former community assets violates both Louisiana law and the August Consent Order.[177]

Hank Ton acquired Bullock while married to Lynda Ton and domiciled in Louisiana.[178]  The Parties stipulate that it is community property.[179]  As such, the Parties each own an undivided one-half interest in Bullock.[180]  However, Hank Ton is listed as the sole owner of record on its title.[181]  The Parties stipulated that the value of Bullock is $1,020,000.00, and it is subject to a mortgage in favor of Whitney recorded on December 18, 2013.[182]

When Hank and Lynda Ton finalized their divorce in August 2013,[183] the August Consent Order granted Hank Ton exclusive use of Bullock pending a later partition of community property.[184]  However, the Divorce Judgment enjoined Hank from alienating or encumbering Bullock.  It provides:

> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that an Injunction shall issue herein, directed to the parties, their agents and assigns, prohibiting them from alienating, encumbering, wasting, disposing of, transferring, concealing or damaging any assets of the parties, the nature of which may be disputed as to whether community or separate to include the changing of any beneficiaries on any

---

[176] P-42 at 30.
[177] *Id.* at 30-36.
[178] Exh. B4, B5, B6, B7, B8, B9.
[179] Stip.  11; Exhs.  B4–B11; P-38, ¶ 11; *See also* La. C.C. art. 2340.
[180] La. C.C. Art. 2369.2.
[181] Exh.  B4-9.
[182] Stip.  11; Exhs.  B4–B11.
[183] Exh. A2.
[184] Exh. A3 at 1.

29

policies or accounts, and disposal of any property of the parties, without court order or written consent of both parties.[185]

Despite the Divorce Judgment and August Consent Order, Hank Ton executed a Modified Deed of Trust which  granted Whitney a security interest in Bullock.[186]

Mississippi law governs the validity of the Modified Deed of Trust in favor of Whitney because Bullock is located in Mississippi.[187]  Lynda Ton argues that Whitney's mortgage is invalid because it was obtained without her consent and after Termination.[188]  In Mississippi, a person holding record title may lease, sell, encumber, or otherwise alienate the property.[189]  Those with unrecorded or inchoate property rights are not protected unless they file something of record.

Mississippi law provides that when a suit affecting real property is filed, the movant must file a notice of *lis pendens* in the county where the property is located.[190]  A *lis pendens* gives notice of a potential claim on real property.[191] If a notice of *lis pendens* is not filed, "such suit ... shall not affect the rights of . . . incumbrancers of such real estate, unless they have actual notice of the suit . . ."[192]

A *lis pendens* warning of the pending divorce was not filed in the records of Mississippi. Lynda Ton offered no evidence that Whitney had actual knowledge of the divorce proceedings.

---

[185] *Id.*  at 1–2.

[186] Exh. F1 at "Exhibit 5" to Whitney's Proof of Claim 8-1.

[187] "The general rule concerning conveyances of real property is that the law of the place where the realty is located controls. . ." *Schewe v. Bentsen*, 424 F.2d 60, 62 (5th Cir. 1970).  *See also Succession of Martin*, 147 So.2d 53 (La. App. 2 Cir. 1962) ("Our jurisprudence has consistently recognized the *lex loci rei sitae* when confronted with real property situated in another state.").

[188] P-42 at 36.

[189] Miss.  Code Ann. § 89-5-1 and 89-5-3.

[190] Miss. Code Ann. § 11-47-3.

[191] *Hooker v. Greer*, 81 So.3d 1103, 1109 (Miss. 2012).

[192] Miss. Code Ann. § 11-47-9.

Therefore, since the law entitles Whitney to rely on the public records, its security interest in Bullock is valid.

The same may be said of the Florida Condo.  In Florida, the record title holder may lease, sell, mortgage, or encumber his interests.[193] Both Lynda and Hank Ton were title holders of the Florida Condo.[194]  Under Florida law, Hank Ton was free to mortgage his half of the property.[195] However, Whitney's Mortgage does not affect Lynda Ton's ownership interest.

As between Hank and Lynda Ton, Louisiana law determines their rights. La. C.C.art. 2369.4 states:

> A spouse may not alienate, encumber, or lease former community property or his undivided community interest in that property without the concurrence of the other spouse...In the absence of such concurrence, the alienation, encumbrance, or lease is a relative nullity.

While the validity of the Whitney encumbrances cannot be challenged, the Civil Code provides a mechanism for accounting between the spouses in the event of breach. La. C.C. art  3525 states:

> Upon the termination of the community between spouses, either of whom is domiciled in this state, their rights and obligations with regard to immovables situated in another state acquired during marriage by either spouse while domiciled in this state, which would be community property if situated in this state, shall be determined in accordance with the law of this state. This provision may be enforced by a judgment recognizing the spouse's right to a portion of the immovable or its value.

---

[193] § 695.01, Fla. Stat. (2013).
[194] Exh.  B2.
[195] *Hamilton v. Hughes*, 737 So.2d 1248 (Fla. 5th DCA 1999).

"La. C.C. art. 3525 is designed to protect the interests of a party whose spouse purchases out-of-state immovable property on his own while using community funds."[196]  By encumbering Bullock and the Florida Condo, Hank Ton violated the Divorce Judgment and La. C.C. art. 2369.4.[197]

He also violated the duty owed to Lynda Ton pursuant to La. C.C. art. 2369.3, which provides:

> A spouse has a duty to preserve and to manage prudently former community property under his control in a manner consistent with the mode of use of that property immediately prior to termination of the community regime. He is answerable for any damage caused by his fault, default, or neglect.

As a result of this violation, Hank Ton owes damages to Lynda Ton which will be addressed below under the section of this Opinion concerning mismanagement..

### C.  Reimbursement Claims

The Court must account for income or advances derived from former community property, as well as reimbursements owed to the Parties since the filing of the Divorce Petition.[198]

In addition, the Final Support Judgment awards Lynda Ton $3,783.00 per month from January 13, 2014, forward.[199]  Hank Ton and Abe's have made substantial payments to Lynda Ton since January 13, 2014, on this obligation which must be reconciled with the Final Support Judgment.

---

[196] *Succession of Sylvester,* 15-125 (La.App. 5 Cir. 12/9/15); 181 So.3d 250, 259.

[197] La. C.C. Art. 2369.4 provides:
> A spouse may not alienate, encumber, or lease former community property or his undivided community interest in that property without the concurrence of the other spouse, except as provided in the following Articles.  In the absence of such concurrence, the alienation, encumbrance, or lease is a relative nullity.

Because Mississippi law controls the validity of Whitney's mortgage, the encumbrance is not a relative nullity. However, Hank must answer for his violation of Louisiana law and 25th JDC Orders.

[198] La. C.C. arts. 2358, 2358.1, 2364, 2365, and 2367.

[199] Exh.  A20–A21.

The Court must also account for the satisfaction of Loan 1 by Hank Ton while also considering that his responsibility for its satisfaction is contingent.  Finally, some recompense must also be made for the encumberance of community assets in violation of 25th JDC rulings and Louisiana law.

### 1. Advances Made to Lynda Ton

The Parties stipulated that the following payments were made to Lynda Ton after Termination:

| Payments made to Lynda to from Community Property | |
| --- | --- |
| Wages paid by Abe's from 11/14/2012 to 2/15/2014 | $226,250.00[200] |
| Direct payments from Hank Ton to Lynda Ton 12/16/2014 to 12/31/2015 | $262,500.00[201] |
| Rents paid to Lynda from Abe's 3/1/15- 2/15/17 & 5/1/17- 7/12/17 | $315,000.00[202] |
| Payments from Abe's | $40,732.00[203] |
| Payments made by Abe's for expenses incurred in connection 299 Sarah Victoria Drive, Belle Chasse, Louisiana, including payment of insurance, property taxes, and for cleaning and repairs | $19,473.00[204] |

---

[200] Exhs.  E1– E3.
[201] Exhs.  E5 and A20.
[202] Exhs.  E6 – E7.
[203] Exhs.  E7– E12.
[204] P-38, Stips.  58–62.

Under the Final Support Judgment, Lynda Ton is entitled to $3,783.00 per month from January 13, 2014 to present, a period of 57 months,[205] or $215,631.00 in support payments.[206]   She received a total of $262,500.00 from Hank Ton.[207]   In addition, $19,473.00 in expenses paid by Abe's for the maintenance and protection of Sarah Victoria Drive are additional support under the 25th JDC Consent Orders.  The total support paid is $281,973.00.

| Reimbursement Claim for Support Payments Calculation | |
|---|---|
| Support due from<br>1/13/14 to 9/30/18<br>57 payments of $3,783.00<br><br>(P-38, Stip 7 Exhs. A-5, 9, 19, 20,  21) | $215,631.00 |
| Support payments made:<br>2/16/14-12/31/15<br>(P-38, Stips. 57-58; Exhs. E-5, A-20.) | $281,973.00 |
| Advance on community in favor<br>of Hank Ton | $66,342.00 |

Lynda Ton was overpaid support  in an amount equal to $66,342.00.  Under the 25th JDC Final Support Judgment, this sum is to be treated as an advance of community property.[208]

According to 25th JDC rulings, wages or other advances from community businesses are advances of community property.  Similarly, rents paid to Lynda Ton are also a share of community income earned from former community property. Lynda Ton received  $315,000.00 related to rents and $266,982.00 in profits from Abe's.[209]

---

[205] Exhs.  A20–A21.

[206] *Id.*

[207] $262,500.00 + 19,473.00 = 281,973.00

[208] Stip. 7; Exh. A20.

[209] $226,250.00 + 40,732.00 = $266,982.00

34

## 2. *Advances Made to Hank Ton*

The Parties stipulated the following payments were made to Hank Ton following Termination:

| Payments made to Hank Ton from Community Property | |
|---|---|
| Wages from Gulf Wells in 2013 | $39,000.00[210] |
| Wages from B&H Marine | $96,372.00[211] |
| Advance from Gulf Wells on 4/15/14 to pay 2013 tax liabilities | $175,000.00[212] |
| Capital Gain from SHS Prudential | $5,311.00[213] |
| Taxable Interest from Whitney Bank | $364.00[214] |
| Capital Gain from Stifel | $2,115.00[215] |
| Dividends from Stifel/Prudential | $1,120.00[216] |
| Balance Whitney Acct #1224 | $18,040.00[217] |
| Ameriprise Trust Plan Account #4133 | $96,933.00[218] |
| Prudential Life Insurance Policy Cash Value | $263,924.00[219] |
| Wells Fargo Advisors Prudential Annuity Account #6285 | $173,856.00[220] |
| Stifel Account #5834 | $70,676.00[221] |
| Whitney money market account | $213,486.00[222] |

---

[210] Exh. D2.
[211] Exh. D2.
[212] Exh. D2.
[213]  Exh. D2.
[214] Exh. D2.
[215] Exh. D2.
[216] Exh. D2.
[217] P-38, Stip.  36.
[218] P-38, Stip.  37.
[219] Exh.  D3.
[220] P-38, Stip.  38.
[221] P-38, Stip.  39.
[222] P-38, Stip.  40.

| Rents from Abe's 3/1/2015-12/31/2015 | $75,000.00[223] |
| Rents from Abe's 2013 | $260,000.00[224] |
| Rent from Abe's 2013 | $130,000.00[225] |

As with the rents paid to Lynda Ton, the rents paid to Hank Ton constitute advances on income earned from former community property.  Hank Ton received $465,000.00 in rents.[226] Hank Ton also received $39,000.00 from Gulf Wells; an advance of $175,000.00 from Gulf Wells and $96,372.00 from B&H Marine; dividends; interest; and capital gains.  Hank Ton's total distributions of profits is $319,282.00.[227]

### a) Prudential Life Insurance Policy

The former community property included a life insurance policy (the "Policy") with Prudential Financial and its subsidiary,  Pruco Life Insurance Company.[228] On March 16, 2016, Hank Ton surrendered the Policy, and a cash surrender value check was issued to him in the amount of $263,924.12 ("Insurance Funds").[229] Hank Ton transferred the Insurance Funds to Abe's, which deposited them in a dedicated account at Whitney.[230]  Abe's used the dedicated account to pay business expenses.  After paying expenses, $3,838.94 remains in the dedicated account.

---

[223] P-38, Stip.  59.
[224] Exh.  D2. (Rent from 9087 Hwy 23).
[225] Id. (Rent from 9299 Hwy 23).
[226] $75,000.00 + 260,000.00 + 130,000.00 = $465,000.00.
[227] $175,000.00 + 39,000.00 + 96,372.00 + 5,311.00 + 364.00 + 2,115.00 + 1,120.00 = $319,282.00
[228] See Westcott v.  Westcott, 08–1339, p.  11 (La.  App.  4 Cir. 4/17/09); 11 So. 3d 45, 53 ( "Because this whole life policy was acquired and maintained during the community and community funds paid the premiums, the policy is a community asset.") (citing La.  C.C. art.  2338).
[229] Stips.  41–45.
[230] Stips.  41–45.

Lynda Ton argues that the Insurance Funds were an advance to Hank Ton for which she should receive reimbursement.[231]  Hank Ton contends that his actions fulfilled his duty under Louisiana Civil Code article 2369.3 to prudently manage former community property.  He argues that payments (1)  maintained Abe's asset base in the vessels; (2)  allowed Abe's to maintain the revenue stream in the vessels by avoiding the imposition of maritime liens or seizures; and (3) helped Abe's remain in operation because they paid insurance premiums necessary to maintain vessel registrations.[232] He also contends that the transfer of funds to Abe's merely converted former community property from one form into another.[233]

La. C.C. art. 2369.3 states:

> A spouse has a duty to preserve and to manage prudently former community property under his control, including a former *community enterprise*, in a manner consistent with the mode of use of that property immediately prior to termination of the community regime. He is answerable for any damage caused by his fault, default, or neglect.[234]

A community enterprise is not a separate legal entity from the former spouses.[235]  It is most often a proprietorship or joint venture.  Legal entities such as corporations, limited liability companies, and partnerships are not community enterprises even if their ownership is a community asset.[236] Because Abe's is a corporation and, therefore, a legal entity, it is not a community enterprise, and the provisions of Article 2369.3 are inapplicable.

---

[231] P-42 at 10–11.

[232] P-38 at 11–12.

[233] "Real subrogation is the substitution of a thing for another in a universality of assets and liabilities." 2 La. Civ. L. Treatise, Property § 8:10 (5th ed.);  P-43 at 10–12.

[234] Emphasis added.

[235] 16 La. Civ. L. Treatise, Matrimonial Regimes § 5:5 (4th ed.).

[236] *Id.*

Because Hank Ton violated the February Consent Order's terms when he liquidated a former community asset without Lynda Ton's consent, he owes damages to Lynda Ton for its loss.[237] While a cash investment into a community company could mitigate this damage, in fact the decision to advance community cash into a business did not, in theory or otherwise, benefit the former community. Although Hank Ton argues that by reducing Abe's debt the Insurance Funds theoretically increased Abe's value, he also admits that Abe's has a negative net worth of -$1,015,620.00.[238]

Because the investment of the Insurance Funds was done without Lynda Ton's consent and in violation of Louisiana law and several Orders of the 25th JDC,  Hank Ton owes Lynda Ton reimbursement.[239]

### b) Other Former Community Property Alienated by Hank Ton

Finally, Hank Ton's use of monies held in the Ameriprise, Stifel, two (2) Whitney accounts as well as a Wells Fargo Advisor Prudential Annuity, interest, and dividends  violates the terms of the February and August Consent Orders prohibiting the alienation of former community property. As such, Hank Ton owes Lynda Ton reimbursement for the balances existing in each of these accounts.

---

[237] *See* La.  C.C. art. 2369.3.

[238] Assignment of the ownership interests in Abe's to Hank Ton allows him to reap any benefit Abe's realized through this cash infusion.

[239] La C.C. art.  2369.3 (requiring a spouse that does not manage former community property in his control prudently to pay for any damage caused).  The Court halved $263,924.12 rather than the full amount of the policy, since the policy is now in cash form and there is no way of knowing what the policy would be worth if it had remained in the fund.

### 3. Summary of Disbursements

|  | Lynda Ton |  | Hank Ton |
|---|---|---|---|
| Excess Spousal Support | $66,342.00 | Excess Spousal Support |  |
| Rent Distribution | $315,000.00 | Rent Distribution | $465,000.00 |
| Company Profit Distributions | $266,982.00 | Company Profit Distributions | $319,282.00 |
| Use of Community Assets |  | Use of Community Assets (Prudential, WNB, Stifel, WF account, Ameriprise account) | $836,918.12 |
| **Received by Lynda Ton** | $648,324.00 | **Received by Hank Ton** | $1,621,200.12 |

Netting the advances results in a reimbursement claim of $972,876.12 in favor of Lynda Ton.

### D. Damages – Mismanagement of Community Property

Lynda Ton alleges that due to the mismanagement of community assets, the value of the former community has been decreased. She complains that through increases in Hank Ton's guaranty, the encumberance of community assets and the addition of debt to Abe's the community has suffered.

A fiduciary duty exists between the ex-husband and wife regarding the former community.[240]

Louisiana Civil Code article 2369.3 provides:

A spouse has a duty to preserve and to manage prudently former community property under his control, including a former community enterprise, in a manner consistent with the mode

---

[240] *In re Provenza*, 316 B.R. 177, 217 (Bankr. E.D. La. 2003) (citing *McCarroll v. McCarroll*, 701 So. 2d 1280, 1282 (La. 1997); *Pitre v. Pitre*, 172 So. 2d 693, 695 (La. 1965); *Terry v. Terry*, 565 So. 2d 997, 1001 (La. App. 1st Cir. 1990)).

of use of that property immediately prior to termination of the community regime. He is answerable for any damage caused by his fault, default, or neglect.

Article 2369.3 imposes a higher standard of care than existed during the marriage.[241] During the period between the filing of a petition for divorce and the judgment of divorce, La. C.C. art. 2347(a) requires:

> The concurrence of both spouses... for the alienation, encumbrance, or lease of community immovables, . . . all or substantially all of the assets of a community enterprise, and movables issued or registered as provided by law in the names of the spouses jointly.[242]

Nevertheless, a "spouse who is the sole manager of a former community enterprise may alienate, encumber, or lease its movables in the regular course of business."[243]

Although Lynda Ton argues that Hank Ton had no authority to encumber the assets of Abe's or increase its debt,[244] a plain reading of the article leads to a different conclusion. As previously discussed, Abe's is a separate legal entity with the right to incur debt, alienate and acquire assets and operate its business. The management of that business falls to its president, other officers, and the board of directors. Because the Whitney Claims were incurred by Abe's in compliance with all corporate formalities and the monies advanced were used to pay corporate debt or acquire corporate assets, the decision of the company to refinance debt, acquire additional vessels through loans, and pay off corporate tax liabilities does not violate any duty or obligation imposed by law or court order

---

[241] *See* La. C.C. art. 2369.3 cmt. (a) ("The reason for imposing a higher standard of care in managing former community property is that, after termination of the community property regime, the law no longer assumes that a spouse who has former community property under his control will act in the best interest of both spouses in managing it.").

[242] La. C.C. art. 2347(A); *see also* La. C.C. art. 2369.4: "A spouse may not alienate, encumber, or lease former community property or his undivided interest in that property without the concurrence of the other spouse, except as provided in the following Articles. In the absence of such concurrence, the alienation, encumbrance, or lease is a relative nullity."

[243] La. C.C. art. 2369.6.

[244] P-42, at 32.

between these Parties.   The Court does not find that any of these decisions amount to mismanagement of Abe's.

However, one obligation incurred by Abe's and paid with funds advanced by Whitney is a direct result of Hank Ton's mismanagement of Abe's. Hank Ton's admission to tax fraud resulted in Restitution of $3,222.510.00.  As previously explained, half of that sum constitutes a debt Abe's should not have incurred.  The increase in Abe's debt reduces its net worth.  The community, as the sole shareholder of Abe's, suffers this loss.   As a result, Lynda Ton is owed damages equal to $1,611,225.50 plus fines of $25,500.00 and fees of $200.00 or $1,636,925.00.[245]

Hank Ton also encumbered former community assets in favor of Whitney causing a potential loss to Lynda Ton.  The wrongful encumberance of former community assets can be equalized by distributing them to Hank Ton.

Finally, through novation or timing and as more fully set forth above, the obligations owed by Hank Ton under the Whitney guaranty are now all separate.  Nevertheless, a portion of that debt was community (Loan 1), and Hank Ton is entitled to reimbursement for its satisfaction through novation.  This can be used to offset Lynda Ton's damages through Abe's loss of net worth. [246]

---

[245] The amount borrowed by Abe's to satisfy Restitution $3,222,451.00.  Half of that amount constitutes the employees' share of taxes or $1,611,225.50, that should have been collected from employee wages.  Instead, Abe's was forced to satisfy this sum through a loan.  In addition fines of $25,500.00 and a $200.00 fee were assessed resulting in a damage claim of $1,636,925.50.

[246]   The former community debt from Loan 1 is calculated as follows.  Loan 5's original principal balance of $6,105,010.79 paid off Loan 1, 4, and advanced additional credit.  The payoff of Loan 1 was $2,010,082.17; the a payoff of Loan 4 was $412,072.77; and the extension of additional credit was $3,682,855.85.  Therefore, Loan 1 represented 32.92% of Loan 5's initial balance.  As of April 27, 2018, loan 5 had a balance of $5,404,340.00 32.92% of which $1,779,108.73 is attributable to Loan 1.

### E.  Claim for Special Circumstances

Lynda Ton argues that her medical condition[247] should be considered in allocating the community assets.  Lynda Ton offered no evidence of unreimbursed medical costs or loss of wages due to a medical condition.  Nor did she offer proof of said condition.  As a result, she has failed to carry her burden of proof on the issue.

### F.  Division of Former Community Property

The division of former community property and debt is set forth on Exhibit A to this Opinion.  It was calculated by taking the total value of all remaining assets of the former community and providing Lynda Ton a reimbursement claim of $972,876.12.

The Court has distributed the entirety of Abe's to Hank Ton.  However, Abe's fair market value has been adjusted for purposes of this partition.  Although Abe's starts with a fair market value of $-0-, in reality Abe's has a negative net worth of -$1,015,620.00 when all assets and liabilities are considered.  Its negative net worth is attributable in part to the extra $1,636,925.50 in damages incurred as a result of Hank Ton's criminal actions ("Restitution Credit").  The Court has assessed this damage against Hank Ton by increasing the net worth of the company to $621,305.50.[248]

The assessment of Lynda Ton's damage claim through a recalculation of Abe's net worth in theory results in the reduction or elimination of any call on the guaranty.  However, even if community assets are foreclosed on by Whiney, Abe's value will increase.  If Abe's pays the debts, community property will not be seized to satisfy them.  Either way, the debt can only be paid once

---

[247] Lynda Ton testified that she has a bulging lumbar disc and other neck and brain problems and that she is in need of additional surgical procedures.  TT LyndaTon.
[248]  -$1,015,620.00 + $1,636,925.50 = $621,305.50

and because the Court has distributed Abe's, Bullock, and half of the Florida Condo to Hank Ton, this paradigm is resolved.

The Court next considered Hank Ton's reimbursement claim based on the conversion of former community debt (Loan 1) into separate debt by novation.   Loan 1 had a balance of $2,010,082.17 when it was consolidated into Loan 5.[249]   Loan 5's original balance was $6,105,010.79.[250]  Loan 1 comprised 32.92% of Loan 5.  On April 27, 2018, the balance due on Loan 5 was $5,404,340.92.[251]  Loan 1's proportionate share is  $1,779,108.73.

Loan 1's proportionate share has been included in Abe's net worth, and Abe's net worth remains positive due to the Restitution Credit.  Therefore, in theory there should be no call on Hank Ton's guaranty.   Given that Abe's positive net worth was accomplished by artificially increasing it to offset the damages owed to Lynda Ton, Hank Ton may indeed be forced to pay on his guaranty. To maintain the offset for the Restitution Credit, any reimbursement due Hank Ton must be delayed or suspended.  Thus, until Hank Ton satisfies $1,636,925.00 in debt to Whitney from his personal assets, he may not collect half the difference of any additional amounts he personally pays up to Loan 1's allocated balance of $1,779,108.73 from Lynda Ton.

---

[249]  Exh.  W5.
[250] Exh. F1, Whitney Proof of Claim 8-1, Part 2 at 5.
[251] Exh. F1, Whitney Proof of Claim 8-1, Part 2 at 1.

In the final analysis, Lynda Ton has been given assets with a net value of $2,980,522.00.

Hank Ton has received assets with a net value of $2,467,875.50.  The difference between the Parties,

$512,646.50, represents a payment on the reimbursement claim of $972,876.12 owed Lynda Ton.

To completely satisfy the reimbursement claim, Hank Ton owes an equalizing payment of

$460,229.62.

New Orleans, Louisiana, August 14, 2019.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge

**EXHIBIT A**           **DISTRIBUTION**

| ASSET | FMV | LYNDA TON | HANK TON |
|---|---|---|---|
| Abe's | $621,305.50[1] | $-0- | $621,305.50 |
| B&H | 105,509.00 | -0- | 105,509.00 |
| Mardi Gras Central | 67,000.00 | -0- | 67,000.00 |
| Gulf Wells | 104,061.00 | -0- | 104,061.00 |
| Heather Marine | -0- | -0-- | -0- |
| Magnolia Outdoor Outfitters | -0- | –0– | -0- |
| 9087 Hwy 23 | 960,000.00 | 960,000.00 | -0- |
| 9297-9299 Hwy 23 | 320,000.00 | 320,000.00 | -0- |
| 1079-80 Bullock MS | 1,020,000.00[2] | -0- | 1,020,000.00 |
| MS parcel 900648-C | 320,000.00 | 320,000.00 | -0- |
| 115 Battistella | 9,050.00 | 9,050.00 | -0- |
| 137 Battistella | 265,000.00 | 265,000.00 | -0- |
| 33066 Hwy 11 | 9,500.00 | 9,500.00 | -0- |
| 299 Sarah Victoria | 370,000.00 | 370,000.00 | -0- |
| 1500 Emerald | 1,100,000.00[3] | 550,000.00 | 550,000.00 |

---

[1] -$1,015,620.00 + $1,636,925.50 = $621,305.50

[2] Mortgage debt owed to Whitney has not been calculated into net worth because 1) it was wrongfully incurred; 2) it has already been calculated into the net worth of Abe's; and 3) if a portion of Whitney's Claims are satisfied by this property, Abe's net worth will increase by a corresponding amount.

[3] Fair Market Value represents the anticipated net sales proceeds. Mortgage debt owed to Whitney on Hank Ton's share has not been calculated into net worth because 1) it was wrongfully incurred; 2) it has already been calculated into the net worth of Abe's; and 3) if a portion of thr Whitney Claims are satisfied by this property, Abe's net worth will increase by a corresponding amount.

Coast, Blvd.
Destin, FL

| | | | |
|---|---|---|---|
| 2009 Dodge Challenger | 19,800.00 | 19,800.00 | -0- |
| 2007 Bombardier | 21,295.00 | 21,295.00 | -0- |
| Jet ski & Trailer | 4,500.00 | 4,500.00 | -0- |
| 1968 Camero | 45,000.00 | 45,000.00 | <u>-0-</u> |
| 1971 Ford Mustang | 25,000.00 | 25,000.00 | -0- |
| 2005 FLHTCI Electra Glide Motorcycle | 8,500.00 | 8,500.00 | -0- |
| 2010 ZX 1400 Ninja Motorcycle | 6,500.00 | 6,500.00 | -0- |
| 2005 Bourget Fat Daddy Motorcycle | 15,000.00 | 15,000.00 | -0- |
| 2005 Bourget Low Blow Chopper Motorcycle | 15,000.00 | 15,000.00 | -0- |
| Retirement Accounts | <u>16,377.00</u> | <u>16,377.00</u> | <u>-0-</u> |
| **Total** | | **$2,980,522.00** | **$2,467,875.50** |
| Reimbursement | | | <u>972,876.12</u> |
| **Adjusted total** | | | **$3,440,751.62** |
| **Cash equalizing payment Owed to Lynda Ton** | | **$460,229.62**[4] | |
| **TOTAL** | | **$3,440,751.62** | **$3,440,751.62** |

---

[4] $3,440,751.62- 2,980,522.00 = $460,229.62